Tom **RIDDELL** et al., Plaintiffs,

v.

The **NATIONAL DEMOCRATIC PARTY** et al., Defendants.

Civ. A. No. 72J–74(R).

United States District Court, S. D. Mississippi, Jackson Division.

July 5, 1972.

---

George F. Woodliff, Curtis E. Coker, Melvin B. Bishop, Jackson, Miss., for plaintiff.

Frank R. Parker and John C. Brittain, Jr., Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for defendants Evers, Henry, Derian, Watkins, Sanders, Parker and Garner.

Joseph A. Califano, Jr., Earl C. Dudley, Jr., Thomas E. Patton, Williams, Connolly & Califano, Washington, D. C., for defendants National Dem. Party, Dem. National Comm., Lawrence J. O'Brien and Patricia Roberts Harris; Charles Morgan, Jr., Morris Brown, Emily Carsow, Neil Bradley, Atlanta, Ga., Co-Counsel.

A. F. Summer, Atty. Gen., of Mississippi and Heber Ladner, Jr. and William A. Allain, Asst. Attys. Gen., Jackson, Miss., for defendants.

## OPINION OF THE COURT

DAN M. RUSSELL, Chief Judge.

Individually named officials of the Executive Committee of the Democratic Party of the State of Mississippi, individually named delegates to the National Democratic Convention, and individually qualified electors affiliated with the Democratic Party of the State of Mississippi, herein identified as Regulars, who allege that they have and will comply with the requirements of the Call to the 1972 Democratic National Convention, beginning July 10, 1972, have filed this class action on behalf of the groups they represent against the National Democratic Party; the National Democratic Committee; Lawrence J. O'Brien, chair-

man; Mrs. Patricia Roberts Harris, acting chairman of the National Democratic Party Credentials Committee; Charles Evers, national committeeman; Aaron E. Henry, Mrs. Patricia Derian, and J. Wesley Watkins, purported officials of the Executive Committee of the Democratic Party of Mississippi and purported delegates to the National Democratic Party; and Mrs. Emma Sanders, Frank Parker and John Garner, purported officials of the Executive Committee of the Democratic Party of the State of Mississippi. Defendants at the state level are referred to herein as Loyalists.

Plaintiffs claim jurisdiction under 28 U.S.C. § 1343, 42 U.S.C. §§ 1983, 1985 and 1988, and 28 U.S.C. § 2201 arising out of defendants' denial to plaintiffs of rights, privileges and immunities guaranteed by the First, Fifth, Fourteenth and Fifteenth Amendments to the Constitution of the United States.

The complaint, with a motion for a preliminary injunction, was filed on April 27, 1972. Relief sought is for this Court to declare that plaintiffs are rightfully entitled to the name and title of "The Democratic Party of the State of Mississippi;" that the delegates elected by the Regulars' faction be declared the only properly elected delegates to the Convention; declare that the precinct elections held by the Loyalist faction pursuant to the call of Aaron E. Henry are null and void as violative of the statutes of the State of Mississippi and the rules and regulations of the National Democratic Party in depriving the Democratic electors of the State of Mississippi of their constitutional rights to have a voice in the Democratic election processes; enjoin the named state defendants and all persons comprising the Loyalist faction from using the name "The Democratic Party of the State of Mississippi" in their official communications, conduct of party affairs and participation in the convention unless they become affiliated with the lawful Democratic Party of the State of Mississippi;

to enjoin that class of the state defendants holding themselves out as the duly elected delegation from the state party and from taking seats at the Convention; to enjoin the national defendants from recognizing or according legal status to the Loyalist faction at the Convention; order an accounting of all funds collected by the Loyalist faction in the name of the Democratic Party of the State of Mississippi, and costs and attorney fees.

On motions by plaintiffs requesting an order accelerating the time for defendants' responses to discovery pleadings and to consolidate the preliminary hearing with a hearing on the merits, and upon a hearing on said motions, this Court on May 5, 1972 directed defendants to respond to plaintiffs' discovery pleadings by May 24, 1972, and directed that trial on the preliminary injunction be continued until May 30, 1972, at which time the Court would consider the motion to consolidate. The state defendants thereafter moved to dismiss on the grounds that the issues presented no justiciable question, being merely political issues relating solely to the internal and political philosophies of the National Democratic Party, hereinafter called NDP, and as to which the Court is without jurisdiction. State defendants further averred that plaintiffs made no allegations that they were denied the right to participate in the defendants' meetings and selections of delegates; that plaintiffs, knowing that defendants had been recognized by the national party, nonetheless conducted their own selection of delegates, fraudulently representing to the voters of Mississippi that their elections were conducted in accordance with the Call of NDP. The national defendants moved to dismiss on the grounds that (1) the complaint fails to state a claim upon which relief can be granted, (2) lack of a justiciable controversy, and (3) plaintiffs have an available remedy before the Credentials Committee which makes inappropriate the intervention of a court of equity. Na-

tional defendants do, however, concede that state action is present. State defendants do not.

Plaintiffs moved for a summary judgment, later supplemented, based on affidavits including proofs of publications that the Loyalists' notices of precinct meetings were to be held at 8 P.M. at "places to be designated"; numerous affidavits showing precincts where the Loyalists failed to hold meetings; an affidavit of the secretary of the Regular faction listing their slate of delegates and committeemen and a breakdown of their race, sex and age, and certifying that they comply with the requirements of the NDP; the minutes of the Regulars' state convention of 1972 and the minutes of the Regulars' Executive Committee for 1971 and 1972; certificates of the Secretary of State certifying the registration of the Regulars' faction and its continuity from its date of registration, April 7, 1950 to date; the official returns of the state gubernatorial election of November 2, 1971, conducted by the Regular faction, showing 601,222 votes for the Democratic candidate, now Governor William L. Waller, and 172,762 votes for Charles Evers, the candidate with the next highest vote, and who ran as an independent, but is now purportedly a member of the Loyalist faction, a National Committeeman, and a defendant herein; affidavits, including those of blacks, showing that Regular precinct and county meetings were held according to statute at 10 A.M. *at the regular voting places*, that secret ballots were used, and that otherwise delegates from each level of the Regular Democratic voting processes were chosen in accord with the fullest safeguards available in a democratic process.

During the course of the hearing which began on May 30, 1972 and continued for two weeks, state defendants moved to bring in the Governor, Attorney General and Secretary of the State of Mississippi, individually and as members of the State Board of Election Commissioners. This motion was granted conditionally at the end of the trial,

before the added parties had time to respond, and is re-considered by the Court herein.

On May 31, 1972, after the hearing was well under way, state defendants answered, asserting that they are the Democratic Party of the State of Mississippi, offering as defenses the grounds set forth in their motion to dismiss. State defendants also filed a counter-claim, along with a motion for a preliminary injunction, against plaintiffs and the added parties, and a cross-claim against the national defendants, in the former charging that the Regulars and added parties, have, under color of law, monopolized the name "Democrat" in the context of electoral politics in Mississippi, and have deprived of the right to use that name those who adhere to the policies, principles and candidates of the NDP; that they have traditionally excluded blacks from party participation, nor have they historically supported the racial policies and platform of the presidential nominees of the NDP; that the Loyalist faction was recognized at the 1968 Convention and received the official Call to the 1972 Convention because of their active support of NDP. Counter-plaintiffs additionally charged that they offered a share of representation in the Mississippi delegation, if in return counter-defendants would provide counter-plaintiffs an opportunity to participate in state party affairs but that the offer was rejected. For relief, counter-plaintiffs seek a declaration that NDP cannot be compelled to associate with individuals or any political party which discriminates against blacks; that counter-defendants have now and in the past engaged in racially discriminatory practices and that the NDP's refusal to recognize counter-defendants does not violate rights guaranteed by the Constitution; that counter-defendants' action, including the lawsuit, constitute an attempt to deprive black voters of their right to freely associate with a political organization of their choice and should be enjoined; that cross-plaintiffs are the lineal successors to that party duly

registered with the secretary of state, and are exclusively entitled to conduct all affairs of that party; that counter-defendants be enjoined from further use of the name "The Democratic Party of the State of Mississippi"; and that added defendants be ordered officially to recognize counter-plaintiffs as the exclusive representatives of the Democratic Party of the State of Mississippi. No cross-claim allegations were made against national defendants but cross-plaintiffs seek that said national defendants be enjoined from recognizing, conducting hearings upon or otherwise honoring any challenge to the seating of the delegates selected by cross-plaintiffs. National defendants, in answer to the cross-claim, set out the same defenses as in their motion to dismiss the complaint, pleading lack of jurisdiction of the Court, lack of a justiciable controversy, and that cross-plaintiffs have a full and adequate remedy under the procedures of NDP. During the second week of the hearing national defendants answered the original complaint, again averring as defenses the grounds in their motion to dismiss. Otherwise they admitted the Loyalists had been seated at the 1968 Convention and had received the official call to the 1972 Convention as the group recognized by DNP.

Near the end of the hearing, the state defendants moved to amend their counter-claim, elaborating on the charges against the added parties and seeking a declaratory judgment that Sections 3107 through 3107–07 of the Mississippi Code of 1942 are unconstitutional on their face. Such a hearing would have required the designation of a three-judge court. Because of the time limitations imposed for a conclusion of this action, the motion was denied.

Although defendants filed no counter-affidavits to plaintiffs' motion for a summary judgment, it is obvious that there are many disputed facts and inferences from undisputed facts from which different conclusions may be drawn, and, accordingly, the Court overrules plaintiffs' motion. Gulf Insurance Company v. Kolob Corporation, 10 Cir., 404 F.2d 115. The Court reserved ruling on all other undisposed of motions, including those denying the jurisdiction of the Court for lack of a justiciable controversy and for a consolidation of the preliminary hearing with a hearing on the merits. As to the latter, plaintiffs and state defendants concede that a full hearing was had and the Court intends in this opinion to treat the entire action. The Court also finds that it has jurisdiction, there being the necessary state action involved, which the national defendants concede; there is a charge that the defendants have denied plaintiffs the right to have a voice in the national elections and the action presents a justiciable controversy in which this Court can apply reasonable standards for relief. See State of Georgia v. National Democratic Party, 145 U.S.App. D.C. 102, 447 F.2d 1271.

It is true that in the past Mississippi, in its laws, practices and customs, as have other states, has been guilty of racial discrimination. In this hey-day of emphasis on the rights of minority groups, Mississippi has been the chief target of civil rights actions gauged to rid her of her unconstitutional statutes and practices. Perhaps the state has yet a long way to go, but the experience of this Court is that past evils are rapidly being corrected. The Court's concern is that the vendetta may over reach itself and result in a polarization of the races, a future as deplorable as the past. The present suit calls for a careful consideration of equities and law lest the minority of the Democratic voters of the state represented by the Loyalists be vindicated at the expense of the right of the majority group, the Regulars, to participate in national elections as members of the national party.

The Regulars allege, in essence, that the Loyalists, in the electoral processes of selecting delegates to the 1972 Democratic National Convention, herein called Convention, have illegally selected a spurious slate of delegates in violation of the statutes of the State of Mississippi

pertaining to same, have violated the one-man, one-vote principles guaranteed by the Fourteenth Amendment, and the rules of the National Democratic Party, herein called NDP, in depriving plaintiffs and the classes they represent of the right to have a voice in the selection of delegates to the Convention. The Regulars charge the national defendants with cooperating and conspiring with the Loyalists, in violation of the aforesaid laws, by recognizing the Loyalists as the Democratic Party of the State of Mississippi in defiance of state law and its own party rules.

Section 3107–01 of the Mississippi Code of 1942, Annotated, enacted in 1950, required the registration of political parties within the state with the secretary of state within 30 days of the enactment of the statute, and, thereafter, provides that no political party shall use or register any name or part thereof which has already been registered with the secretary of state, nor use any name in any campaign literature listing or describing its candidates which does not correspond with the name of the registered party. Section 3107–02 sets forth the requirements for the application for registration. Section 3107–03 provides that no political party shall conduct primaries or enter candidates in any election unless such parties have been duly organized under the provisions of Section 3107, as amended, and unless registered as provided in this act. Section 3107–04 provides that no person shall claim or represent himself in any manner to be a member of any state, district or county executive committee of any political party in the state, or claim to be the national committeeman or committeewoman or any other officer or representative of such political party without having been elected or chosen as such in the manner provided by the laws of this state. Section 3107–06 forbids any person or group of persons to set up or establish any political party in this state, except in the manner provided by law and declares it to be unlawful for any person or group of persons not lawful members thereof to use or attempt to use the name of any other political party lawfully existing and operating under the laws of this state. In addition to other penalties provided by law, injunctive relief may be afforded upon application to the courts by any person, persons or political party aggrieved thereby. Section 3107, in providing the manner in which state, district and county executive committees shall be chosen, also provides that the state executive committee, or the chairman thereof, shall designate a date, giving at least 10 days' notice, for the precinct elections, on which date the electors at such precinct *shall meet at ten o'clock A.M. at the usual voting places,* and by secret ballot elect delegates to represent such voting precincts in the county convention. The salutary effect of these statutes is obvious.

Despite the fact that the 1972 Call to the Convention was sent by the National Democratic Committee and defendant Lawrence J. O'Brien to Aaron Henry, chairman of the Loyalist group, the evidence is overwhelming that between the 1968 Convention, at which the Loyalists' delegation successfully challenged the Regular delegation and was seated, and the late part of 1971 when the Loyalists began to organize for their caucuses to select delegates to the 1972 Convention, they neither sought official recognition from the State of Mississippi, through a party name other than the Regulars', nor conducted any state primary elections, nor assumed any of the other responsibilities of a viable state political party. The Regulars have continued to be recognized and to conduct elections. State wide elections were held in 1971 from constable to governor. The Regular party through its committees, officers and party machinery continued to hold primary and general elections and certify the results of such elections as they have in the past. In 1971 Democrats were overwhelmingly elected to office under the Regular party's banner and certified by its officers, this despite

the bitterness resulting from the unseating of their slate of delegates to the Convention.

Plaintiffs' witnesses, primarily various members of the state executive committee, stated that when they heard the Call had been issued, they set about the business of scheduling their precinct meetings, county, district and state conventions, at the times and places pursuant to state statutes, and conducted those meetings pursuant to Section 3 "Qualifications of Delegates", as set forth in the Call. This section provides that a state Democratic Party in selecting and certifying delegates and alternates to the Convention will undertake to assure that all Democrats of the state will have meaningful and timely opportunities to participate fully in the election or selection of delegates and will undertake to assure that such delegates have been selected through a process in which all Democratic voters have had a full and timely opportunity to participate.

■ The essential aim of the cited Mississippi statutes controlling political party electoral processes is that voters and those who wish to participate have notice of the caucuses and conventions at a fixed time and place, with an unfettered opportunity to participate, free from confusion and intimidation. That this idyllic situation was not true prior to 1968 is of record, and is, indeed, one of the reasons the Mississippi delegation was not seated along with the fear of the National Party that the Mississippi Democrats would not follow the "philosophy" of the National Party. But the unseating of the delegation should by no means be construed as the kiss of death to the state party itself which has continued to be active. And it's activity should be treated in perspective as to what is true in 1972.

Dr. Aaron Henry has for years been active in the N.A.A.C.P., and voter registration for negroes. He was the first chairman of the Freedom Democratic Party as early as 1963. He stated that because of the affinity of Mississippi negroes for President Franklin Delano Roosevelt and their inability to be recognized by state Democrats, he and others who called themselves Freedom Democrats, with the assistance of the AFL–CIO, N.A.A.C.P., Prince Hall Masons, Young Democrats, and a negro teachers' association, formed the Freedom Democratic Party of Mississippi. Other than encouraging voter registration, they conducted no state elections, but chose to seek recognition from the national party. He and Mrs. Fannie Lee Hamer unsuccessfully challenged the state Democratic delegation at the Convention of 1964. Thereafter the Loyalist faction was born and this group was successful at the 1968 Convention in unseating the regular delegation. In late 1971, this group with Henry as chairman, and using a letterhead identifying themselves as the Mississippi Democratic Party of the State of Mississippi sought to register as such with the secretary of state and seek authority to use "regular voting places." They were denied certification by the Secretary of State, called by defendants as an adverse witness, who in his ministerial functions, certainly had no authority to support this group in the place and stead of the registered party. Under Mississippi statutes, Section 3127, the county board of supervisors are charged with establishing regular voting places. The Sunflower County clerk of the board, following a request by Henry for voting places, requested an opinion as to his duties in the premises from the Attorney General. The Attorney General, called on as an adverse witness by defendants, testified as to the opinion he furnished the clerk, advising that the board had no authority to furnish voting places to an unregistered party. With these rebuffs as excuses for not otherwise following Mississippi statutes, Henry sought the services of a team furnished by the DNP to instruct in how to organize their party from the precinct level up and hold conventions for the sole purpose of selecting a slate of delegates to the 1972 Conven-

tion in accordance with the McGovern rules. Henry and J. Wesley Watkins, III, defendant, secretary and legal advisor of the Loyalist Faction, stated that notices were given for precinct meetings to be held at 8 P.M. on January 22, 1972, to news and radio media throughout the state. The notices to newspapers were admittedly in the form of news releases rather than in paid ads, due to lack of funds. Many of these releases designated no meeting places, merely saying that the meetings would be held at places to be determined. In only two counties were any precinct meetings held at the regular voting places, and in several counties precinct meetings were held jointly in one place outside all the precincts except the one wherein the meeting was held. In numerous counties no meetings were held. Although Watkins testified he requested each county chairman to submit a filled-in organizational form of county organizations, he could produce only 31 file folders of county reports at the trial, some of them not complete. He and Henry nevertheless claimed approximately 65 county organizations. Plaintiffs' witnesses placed the number at 15. The parties conceded that in the 82 counties of Mississippi there are over 1900 precincts.[1]

Richard Abbey, from Clarksdale, a young white student who attended the University of Mississippi, became interested in Henry's movement as a Young Democrat. He did not attend his Loyalist precinct meeting or the county convention. He nonetheless attended the district meeting as a delegate from Coahoma County. He stated that he and 5 or 6 others were on a committee to nominate delegates to the National Convention, and that he was shown a list and told that these were the people who had been nominated. His most damaging statement was that he had been employed by Henry and Eddie Smith, a district chairman, to take organizational forms into certain counties where no meetings were held and get them filled and back-dated as of the time precinct meetings should have been held. Among the counties he listed were Tallahatchie, Grenada, Yalabusha, Tishomingo, Ittawamba, Lafayette, and Marshall. Although Henry and Smith both denied directing that these forms be back-dated, Smith admitted that at a meeting held March 12, 1972, at which some officials were not present, Abbey was instructed to obtain organizational forms from about nine counties.

It goes without saying that a regularly specified time and place, and secret ballots at the precinct level are essential to full participation in the voting process, the contrary leading to confusion. Plaintiffs concede that there was not as much black participation in the 1972 precinct meetings as in 1968, but they attribute the lack to the confusion of black voters about which precinct meeting to attend, and the intimidation exerted by Loyalist leaders for them not to attend the Regular precinct meetings. These contentions were verified by black witnesses. Arvern Newsome, black, from Byhalia, Marshall County, Mississippi, stated that he has voted and participated in the Regular Democratic Party since 1940. He attended his precinct meeting at 10 A.M., with all those in attendance, being black. County delegates were selected by secret ballot. He attended the county, district and state conventions as well as other blacks and is an elected delegate to the Convention in Miami from the Regular faction. He stated that the Loyalists did not have a meeting in Marshall County. He called Henry to find out who comprised the executive committee. Henry furnished him some names, but the witness did not know how they got elected. Robert C. Kegler, black, Charleston, Mississippi, an adverse witness called by plaintiffs, is the Loyalist county chairman. He undertook to organize for the Loyalists. In 1968 the precinct and county meetings were at the regular place. In 1972

---

1. The current number is actually 2063 precincts.

he called for precinct meetings and was notified by "headquarters" to hold them at a place other than the regular places. Despite newspaper notices of the meeting, only 2 or 3 people showed up and he called the meeting off. Mrs. S. M. Springfield, black, an adverse witness to plaintiffs, stated that she is chairman of the Grenada County Loyalist faction. She did not recollect how she received the office and conceded that her precinct was never organized.

Cleve McDowell, a black attorney from Drew, Mississippi, in Sunflower County, the second negro to attend the University of Mississippi after James Meridith and the first of many to graduate from its law school, attended the Regular precinct meeting at Drew. He said it was well publicized for 10 A.M., and well attended with approximately 85 present, the racial proportion being even. He also attended the county and district meetings. The Loyalists had no meetings in the county. In November he ran for office on an all black slate and all were defeated. He has known Henry, Evers, Watkins and other leaders of the Loyalists through civil rights meetings but has determined that blacks can do better within the Regular faction than with the Loyalists. He said the Loyalists represent a limited number of people and certainly have no organization to compare with the Regulars. He is a Regular delegate to the Convention. He was joined in his expression by D. Talmadge Webster, a black from Meridian, Mississippi. Originally a Republican, he has been a Democrat for 20 years. He attended the 1968 Convention as a Loyalist, but now is a Regular and feels welcomed to the party, especially through the encouragement of the Governor.

The Regulars through their committee officials, Chairman Tom Riddell, Vice-chairman Ruble Griffin, and Secretary J. E. McDonald, and other witnesses, offered an abundance of proof, none denied, that precinct meetings, and county, district and state conventions were widely publicized and noticed. All officials including the Governor, William M. Waller, titular head of the party, encouraged participation by all those who considered themselves Democrats. The main emphasis of their testimony related to their attempts to seek recognition from the DNP and their efforts to solidify the two factions, including a common slate of delegates to the Convention, through negotiations with Henry and the Loyalist leaders.

McDonald, elected secretary of the Regulars' executive committee at this year's state convention held on February 26, after first testifying as to the openness of his own county and precinct meetings in Jackson, Mississippi, identified the minutes of the state convention, of record herein. The Regulars' convention opened on February 26, 1972, in Jackson, Mississippi. Among other items of business, the minutes show that the convention appointed the Executive Committee to serve as a negotiating committee with national party officers as well as the Loyalists. The convention then went in recess pending the negotiations. McDonald confirmed that the possibility of negotiating with the Loyalists was raised on the floor and that a negotiating team was selected. Some delegates to the National Convention were selected, and the meeting was recessed in order to pursue negotiations, which if successful, would require convention approval. The Loyalists met the next day, February 27, 1972. McDonald attended part of this convention and understood it recessed for the same purpose, to afford both factions an opportunity to negotiate. On or about March 15, 1972, McDonald, Riddell and the Governor visited defendant O'Brien in Washington and had numerous telephone conversations with him and an assistant, Bill Welsh, toward what could be accomplished. They said that O'Brien advised them that the two factions should get one delegation together accompanied by a resolution from the Loyalists accepting the merged delegation. They were not notified that the Loyalists had already filed their slate. On March 28, 1972,

the Regulars' negotiating committee began negotiations with a team from the Loyalists. The Regulars offered for both delegations to go to the Convention with each delegate and alternate to have one-half vote each, with the Governor and Henry to be co-chairmen. The Loyalists' conditions in which they were adamant, went far outside delegate representation and included demands for proportional racial representation in offices at all levels of the Regulars' party, who had previously been elected, appointments to state offices in the ratio of two blacks to one white, voting machines in all precincts and other demands which would require legislative action. On April 12, 1972, McDonald wired O'Brien asking him to forward necessary forms and instructions for the submission of delegates and alternates. On April 17, Mrs. Dorothy Bush, Secretary of the National Committee replied that on February 16, 1972 instructions were sent to the Loyalist Party and that she had received their certification of delegates. No date was shown by her as to when she received the list. She further referred McDonald to Section 4, Procedures for Challenging Delegates of State Delegations, page 13, in the Official Call for the 1972 Democratic National Convention. The Court notes that neither this Call nor any other documents or instructions were sent to the Regulars—all went to Aaron Henry. McDonald acknowledged that he had received Mrs. Bush's communication, but at the time still thought the Loyalist list was incomplete and not final. On May 1, 1972, McDonald wrote the Credentials Committee, attention of Mrs. Harris, a defendant herein, saying that the Democratic Party of Mississippi would file a challenge to the seating of the "Loyalist" party headed by Mr. Aaron Henry. He also said that this group had scheduled a "reconvened" state convention for April 17, 1972, which was not held and that the Regulars had no way of knowing the names of their proposed delegates. He admitted that rumor had it that the Loyalist group had filed a slate

but since "we" do not know whether or not this is true "we" cannot file notice of intent to challenge. McDonald asked that his letter be accepted for two purposes: "(1) official notice that we will contest the delegation; and (2) please serve us with a list of such delegates if the same has been filed." McDonald stated that he received a reply, dated May 22, 1972, from Mrs. Bush, advising that it was not the policy of her office to release delegate lists until after the credentials committee had met, which would be June 25th through June 29th in Washington. Much later in the trial Aaron Henry identified a communication he had received from Mrs. Harris addressed to "State Democratic Party Leaders and Interested Persons," dated March 20, 1972, relating to time schedules for credentials challenges, but it was not shown that this memorandum was received by any official of the Regular Party. McDonald, as well as other Regular officials, said that during all this time O'Brien and Welsh knew negotiations were going on. Negotiations continued up until this suit was filed, even to the extent of efforts on the part of Governor McNair of West Virginia who was asked to mediate. However, Aaron Henry was not available and at the time of the trial all negotiations were fruitless. McDonald was emphatic that he had never seen the Loyalist list of delegates until the day before trial. On May 25, 1972, McDonald submitted to O'Brien a break-down of the list of the Regulars' delegates and alternates, showing that of 25 delegates, 8 are women, 17 men, and of these 15 are white, 9 are black and 1 is Indian. Of the eight women, 3 are white, 1 over 30 years of age, and 2 are under 30. Of the 5 black women, 1 is over 30, and 4 under 30. He gave a similar breakdown of the alternates. McDonald admitted, as the minutes reflect, that a resolution at the Regulars' state convention to adopt the McGovern rules was defeated. Fifteen delegates and fifteen alternates were selected by the state convention as a result of open democratic processes and in

compliance with state law. McDonald and Riddell, chairman of the Regulars' executive committee, both testified that the remaining ten delegates and eight alternates were selected by the executive committee and that in these selections they tried to follow the McGovern rules. Henry, when asked on cross-examination, how the Loyalists' conformed to the McGovern rules, said that he instructed county and district chairmen to see that they were followed. In this Court's opinion, the McGovern rules and democratic processes incorporated in state statutes are irreconcilable.

Riddell confirmed that instructions were given the committee secretary to send out notices of all precinct, county, district and state conventions to the chairman of each of the 82 counties in Mississippi, and that the Regulars have conducted all elections in Mississippi including the gubernatorial election in 1971. He confirmed that on the visit with O'Brien and Welsh in March 1972 that neither mentioned having received a delegate list from the Loyalists. He admitted that Welsh explained to him the McGovern rules requiring representation of races, women and those under 30, which he thinks the Regulars' list complies with but denied that he was ever furnished a copy of said rules or a copy of the Call, neither of which he has ever seen. He stated that he had an agreement with Watkins and Hodding Carter, III, members of the Loyalists' negotiating team that neither faction would submit a slate of delegates, pending negotiations. The Court notes that Carter denied making such an agreement, but that Watkins admitted at the time of the alleged understanding that the Loyalist list was not necessarily final and could be changed. Riddell denied ever having seen Mrs. Bush's communication of April 17, 1972 to McDonald until shown to him during the course of his testimony, saying only that McDonald had told him that he, McDonald was going to seek instructions on delegate selection before June 20, 1972, the deadline for the selection of all state delegates. He confirmed that O'Brien advised that the Regulars could be seated only on a resolution coming from the Loyalists, this at a time when negotiations were beginning and when both parties had recessed their state conventions.

Governor Waller, claiming official immunity from defendants' subpoena as an adverse witness, nonetheless appeared voluntarily. He holds no official office in the state Democratic Party but, by tradition as governor of the state, is the party's titular head. He was elected in November 1971 and inaugurated on January 17, 1972. His opposition in the general election was Charles Evers, who ran as an independent, and his victory was 77% of all votes cast. Aaron Henry, like Evers, was a candidate for office and ran as an independent. Waller testified as to his campaign and inaugural speeches in which he asked for party unity. Athough he holds no office in the Democratic Party he has met with the executive committee and was kept abreast of the negotiating efforts. After they broke down, it was his opinion in his testimony that the Regulars have the only true democratic process in the state, the Loyalists being organized in only approximately 15 counties, that the Loyalists are a small group who have variously called themselves the Freedom Party, Independents, and Loyalists, and they have violated the civil rights of a majority of all Mississippi citizens in an attempt to usurp the Regular party. He charged that the Loyalists surreptitiously, secretly and fraudulently filed their list of delegates, without notifying him or the public, back in February all the while pretending to negotiate. Although he did not meet with the negotiating committees he identified the Loyalists' demands as such that would require legislation and, as far as their demanding the appointment of two blacks to every white in state boards and agencies as within his power, he stated that the Loyalists overlooked the fact that he, as governor, has no control over holdover appointments. The governor referred to

his contacts with O'Brien, Welsh and Governor McNair who, the governor said, spent five days looking for Aaron Henry in an effort to be of assistance in negotiations. With O'Brien and Welsh, the governor said he took the position that his victory at the polls was recognition that the Regulars are the majority party, and that Welsh responded by saying that, except for his personal friendship with Henry, he, Welsh, would like to withdraw the Call to the Convention from the Loyalists. The governor stated that O'Brien did not disavow Welsh's statement.

The governor said that it was at his suggestion that McDonald requested a list of the Loyalists alleged slate of delegates. Until his testimony, neither had he, the governor, seen Mrs. Bush's reply. The governor also said that he had recommended the filing of this lawsuit, because, in his opinion, it presents a legal question involving basic civil rights to be determined before going before the Credentials Committee of the National Party.

Ruble Griffin, vice-chairman of the Regulars' executive committee, and an ex-assistant attorney general for the State of Mississippi has been a member of the Democratic Party since 1946. He stated that each convention is autonomous, but operated under state statutes and under the parliamentary procedure of the House of Representatives. He conceded in the past that the Regular party has adopted racially inflammatory resolutions, but emphatically said this attitude was a thing of the past. He indicated that he seriously considered recommending that the Regulars meet with the Loyalists at precinct meetings and thus merge until he found out their meetings were scheduled for 8 P.M. instead of the legal hour of 10 A.M. As a member of the Regulars' negotiating team appointed by the executive committee, he said the committee had no policy making powers, their function being to hold primary elections, hold the party together and send out the Call every four years for the purposes of selecting delegates to the Convention. In this perspective, he said the Regulars' negotiating team had no authority but to merge delegates. The demands of the Loyalists to (1) merge the two 25 member executive committees, (2) elect delegations based on racial proportions in the county, (3) adopt the Loyalist constitution and by-laws, (4) provide mechanical voting machines in every precinct, (5) have the governor appoint two blacks to every white until a racial proportion is reached, (6) appoint negroes to state agencies until racially balanced, and (7) have an advisory group to have veto powers over federal appointments, were not within their authority to negotiate. He stated that in his county, Hancock, the chairman urged those in attendance to elect delegates from diverse groups, and he, the witness, particularly tried to raise funds to send young blacks to the Convention. He does not know any Loyalists in his county. He outlined the openness of all party meetings from precinct to state levels. He referred to statutes which require that persons who represent themselves to be a member of a primary political party who do not intend to support party nominations are subject to sanction. At this point the Court notes that in the resolutions adopted at the Regular state convention, as reflected in the minutes, the Regulars undertook to assure the voters in the state, regardless of sex, age, race, color, creed or national origin, that they will have the opportunity to participate fully in party affairs and be able to cast their election ballots for the presidential and vice-presidential nominees selected by the National Democratic Convention and to select residential electors pledged formally and in good conscience to the election of these nominees under the party label and designation, and that the delegates so certified will not publicly support or campaign for any candidates for president or vice-president other than the nominees of the Convention. The resolution further provides that the delegates to the Convention when certified by the

Mississippi Democratic Party will participate in the Convention in good faith and that no additional assurances shall be required of delegates to the Convention in the absence of a credentials challenge or contest. This resolution was read twice by request before its adoption. This witness denied that the unit rule had been applied to any state of the election process. It was his opinion that the 15 delegates selected from regional caucuses were selected from as democratic a process as can be had, and that the 10 selected by the executive committee more nearly complied with McGovern rules than the delegate selection of the lower levels. He acknowledged that there was much bitterness in the failure to seat the Regular delegation in 1968; that the decision was pre-determined. At that time Charles Evers was a delegate from the Regulars, but he chose to resign and join the Loyalists solely to contest the Regulars. Although Evers is a defendant herein, he was notably absent from the entire trial. Griffin added that there is now a new day in the Regular party, and that the new governor has given every indication of rejoining the National Party and supporting the national nominees.

Claude Ramsey of Jackson is state president of the AFL–CIO. He estimated its membership at 85,000 with one-third black. The organization is nonpartisan but Ramsey considers himself a Democrat. In 1968 he and Aaron Henry co-chaired a committee to support the Humphrey-Muskie campaign. Also, in that year he was requested by Henry to serve on a Loyalists' steering committee to contest the Regulars' delegation. Ramsey has a history of actively participating through his organization in negro voter registration. He felt that he had made progress with Regular party leaders in opening the ranks to negroes, and he refused to serve on Henry's committee because he could not in good conscience support a challenging party without breaking faith with the Regulars who have agreed to negro participation. As to 1972, he attended his pre-

cinct caucus in Jackson and was elected as a delegate to the state convention. As early as December 1971 he realized the importance of trying to get the two factions together. He consulted with Bidwell Adam of Gulfport, Mississippi, who, prior to 1972, had served for years as the state Democratic party chairman and Jack Travis of Jackson, the 1968 National committeeman. All agreed that they would like more negro participation in the party. In December 1971, Ramsey wrote to a group of Loyalists, including Henry, Watkins, Derian and Carter, defendants herein, and to Regular party leaders for a meeting. Most attended. After Waller's election and avowed purpose to get Mississippi back into the Democratic Party, Ramsey went to see him as well as O'Brien and Welsh in Washington who encouraged his efforts to attain unity. In January 1972, under Ramsey's direction, a letter from his office was sent to all affiliated-union committees saying:

"For the first time in 25 years we have an incoming governor who has the courage to act in the best interest of the State. Bill Waller, acting in his capacity as head of the Regular Democratic Party in Mississippi has instructed the State Democratic Executive Committee to schedule precinct, county, congressional district and state conventions to elect delegates to the Democratic National Convention. . . . It is very important that all union members, white, black, men and women participate in their respective precinct. . . . It is URGENT that the Labor Movement support Governor Waller in this worthwhile effort." It was at Ramsey's request that the resolution for support of the national candidates was re-read on the state convention floor. Ramsey confirmed that both state conventions recessed for the purpose of negotiating and that at this point neither convention had selected a final slate. Neither did he know that the Loyalists submitted a slate on February 28, 1972, one day after their recess, until the trial. In his opinion the Loyalists did not negotiate

in good faith; they exert control in very few counties and are not representative of a large portion of the population of Mississippi.

 It would be of little avail to detail the testimony of defendants' witnesses as to their efforts to organize. That the Loyalists were seated at the 1968 Convention is fact and now history. This Court is convinced that, as of now, the Loyalist faction, albeit recognized by the National Party, is not the official Democratic Party of the State of Mississippi, and to deny the Regulars participation in the National Democratic Convention is to deprive a vast majority of Democrats in the State of Mississippi a voice in the national elections.

Plaintiffs elicited from state defendants the admission that in holding their precinct meetings at 10 P.M. at places other than "regular voting places" the Loyalists had not complied with Section 5 of the 1965 Voting Rights Act, 42 U. S.C. § 1973c, which requires submission of any change in any voting qualification, or pre-requisite to voting, or standard, practice or procedure with respect to voting different from that in force and effect on November 1, 1964, to be approved by the Attorney General of the United States or cleared through the District Court of the District of Columbia. Relocation of polling places in Canton, Mississippi, was found by the Supreme Court to be such a change, and subject to the Act. Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L. Ed.2d 476. As this act has usually been applied only where the change has affected the rights of negroes to vote, the Court, initially, felt it had no application here. However, MacGuire v. Amos, D.C. 343 F.Supp. 119, May 13, 1972, seems to indicate to the contrary. In this case a three-judge court first found that the state (Alabama) "cannot avoid the strictures of the Act by empowering some body other than its legislature to regulate those electoral processes. Where the political parties are given such head by a specific statutory grant of authority, their actions rise to the level of state action." In *MacGuire* the Democratic and Republican parties promulgated rules at issue with statutory rules. As to the application of Section 1973c, the Court ruled that ample time existed for compliance by the defendants with the provisions of the 1965 Voting Rights Act by submitting their rules to the U.S. District Court for the District of Columbia or to the Attorney General of the United States prior to any future use of the rules and/or procedures for the election of delegates.

The Court has great admiration for the leaders of the Loyalist faction, who with support from many sources, have opened the doors in Mississippi to black participation in every kind and level of state activity. It has an equal admiration for the Regular faction work-horses who have held the Democratic Party together, at the same time recognizing that changing times dictate comparable changes in their policies toward negro participation and to which they have responded in a laudable manner.

All parties concede that any credentials challenge made now by the Regulars cannot possibly be made within the time schedules of the Credentials Committee rules. The National Party however, has the machinery to waive these rules and should do so.

This Court is of the opinion that, although the "philosophy" of the National Democratic Party may be altruistic in the apportionment of its delegates, there is in reality no possible method or manner by which a state convention through its "grass roots" and precinct levels can select by secret ballot, in a democratic fashion, a proportionate representation of individuals to comply with such a theory. To do so would compel any such organization to hand-pick delegates rather than through an election process.

The Court recognizes that the Regulars at the precinct, county and district levels had elections for 15 delegates, not selections, according to democratic principles and statutes, attempting to comply with the McGovern rules in only the selection of the ten delegates reserved to

the state executive committee, and that, accordingly, their slate of delegates is valid, whereas, the Loyalist's slate was manipulated to conform to McGovern, and was otherwise not arrived at by any statutory process.

 The Court will grant the relief requested by plaintiffs to the extent of declaring that the Regular faction is the legal, official Democratic Party of the State of Mississippi, and that the Loyalist faction is not. The Court further finds that the Regulars are entitled to a hearing before the Credentials Committee and the full Convention if necessary, under any procedure or arbitration that will afford both factions an opportunity to be heard fully on the merits of their respective claims. The Court declines to grant injunctive relief for either faction as such would be premature. The added parties are dismissed from this action and the counter-claim and cross-claim are dismissed.

Should the Democratic National Convention fail to give the Regular faction of the Democratic Party of the State of Mississippi a hearing on the merits of their challenge, this Court will then entertain a request for such other relief as may be appropriate.

Each faction shall bear its own costs and fees with court costs to be taxed equally to both.

Appropriate orders may be submitted.

## ON MOTION FOR SUPPLEMENTAL RELIEF

 This Court, in a previous opinion on June 22, 1972 declared that the "Regular" faction is the legal official Democratic Party of the State of Mississippi, and that the Loyalist faction is not.

Thus, it further found that the "Regulars" were entitled to a hearing before the Credentials Committee of the National Democratic Party, and if this committee failed to give the Regular faction of the Democratic Party of Mississippi a hearing on its challenge, this

Court "would entertain a request for such further relief as may be appropriate."

Likewise, in the Court's previous ruling, the added parties, Secretary of State, Governor and the Attorney General as Board of Election Commissioners of state were dismissed.

Today, we have been requested to grant further relief to the petitioners who constitute members of the Regular faction of the Democratic Party of Mississippi, (1) to enjoin the Loyalists from being seated as delegates representing the Democratic Party of the State of Mississippi to the National Democratic Convention to be held in Miami within a few days, and (2) to enjoin the so-called Loyalists from using the name of "Mississippi Democratic Party."

This record now shows that, in compliance with the opinion of this Court rendered on June 22nd, the Regulars, or petitioners herein, were granted a hearing before the Credentials Committee of the National Democratic Party. That by unanimous vote of those voting on the Credentials Committee, the plea of the Regulars to be seated was denied, and the so-called Loyalists were seated. The vote being unanimous, precludes any additional hearing on the Convention floor.

Since the National Democratic Party is a political organization, having no statutory rules or regulations to follow, but only rules made by its own membership, and subject to change at the whim of those in power and control at the time, such rules having been made by and through political motives, usually are interpreted by political motives and expediency.

By the National Democratic Party's own designated court—the Credentials Committee—it has attempted to select the "Loyalists" as its representatives from Mississippi to its Convention, and to bar the "Regulars" whom this Court has ruled complied with the Mississippi State Statutes in its selection and election of its delegates.

This Court is not so jealous of its power, that in the proffered exercise of it, would do a vain and futile act. As previously expressed this Court is of the opinion that the so-called "Loyalists" is not to be recognized as the official Democratic Party of the State of Mississippi, and for the National Democratic Party to deny to so-called "Regulars" participation in the National Democratic Convention is to deprive a vast majority of Democrats in the State of Mississippi a voice in the national elections, but it is nothing short of common knowledge, that a President and Vice-President of the United States are not selected and elected by any one political group or organization. One group may make its choice, but it does not preclude other choices being made by other groups, organized or independent.

The testimony in the previous hearing of this case reflects that the so-called "Loyalist" group in Mississippi, alone, could not win an election in the state of Mississippi for the nominee of the National Democratic Party, and with such evidence before it, and available to the Credentials Committee, it made its decision to choose its membership.

This Court feels that is should not be the referee or guardian of the membership of a political organization or its internal problems, and, National Democratic Party being only a political organization and carrying with it only the right and power to select candidates and not the absolute power to elect them, the vast number of individuals who were deprived of the direct voice in nominating a candidate from a party standpoint, are still not without right to vote for or reject those individuals selected as candidates for them by their party choice—or in the alternative, vote for a nominee candidate of another organization, group or groups.

Part of the relief requested here is to enjoin the so-called "Loyalists" from participating in the National Democratic Convention, but to do so would serve no plausible purpose. To do so would prohibit each and every democrat in Mississippi from having a voice in the selection of a candidate for President and Vice-President of the United States to run as a National Democrat.

To refrain from enjoining the Loyalists would at least grant each and every Democrat in Mississippi the privilege or right to speak through some group to the National Convention. The group selected might not voice the opinion of the majority of the electorate of Mississippi, but if not, that is the selection of the national organization, and the national organization takes its political risk—whether the potential stakes are good, bad—or just political.

On the other hand, the uninvited or denied members have their veto voice at the polls, if they are dissatisfied with the choice of the group.

As to an injunction by this Court to bar the Loyalists from using the term of "Democratic Party of the State of Mississippi" or similar words, this Court is reluctant to enjoin said group from using any term or designation it desires when the faction, individually, or as a group appears in convention with its National Colleagues, but this Court is not precluded from protecting its previous findings and order relating to the official Democratic Party of the State of Mississippi.

In accordance with this opinion, the plaintiffs' motion for additional and supplemental relief is denied.

An appropriate order may be submitted with costs relating to plaintiffs motion assessed to plaintiffs.