Tom H. RIDDELL, Jr., et al., Plaintiffs-Appellants, Cross-Appellees,

v.

The NATIONAL DEMOCRATIC PARTY et al., Defendants-Appellees, Cross-Appellants.

No. 72–2437.

United States Court of Appeals, Fifth Circuit.

Feb. 21, 1975.

George F. Woodliff, Curtis E. Coker, James A. Peden, Jr., Jackson, Miss., for plaintiffs-appellants, cross-appellees.

Charles Morgan, Jr., Atlanta, Ga., Norman Siegel, New York City, John C. Brittain, Jr., Frank R. Parker, Jackson, Miss., Joseph A. Califano, Earl C. Dudley, Jr., Washington, D. C., Morris Brown, Emily Carssow, Neil Bradley, Atlanta, Ga., for defendants-appellees, cross-appellants.

William Allain, Asst. Atty. Gen. of Miss., Jackson, Miss., for 3rd party defendant cross-appellees.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge.

This case presents serious issues concerning the operation of our political democracy. In it two different groups vie for the right to call themselves "The Democratic Party of the State of Mississippi" and, when the complaint was originally filed, for the right to represent the Democrats of Mississippi at the 1972 Democratic National Convention. This latter claim was settled by the convention itself, and thus we need not consider it at this time as it has been mooted by the convention action.[1] The primary question presented, however, remains an important and hotly contested one— which of the two groups involved in the suit should have the right to call itself "The Democratic Party of the State of Mississippi" and, inferentially, the extent to which the state of Mississippi or the federal courts can make this type of determination.

## I. FACTS

The state of Mississippi has an extensive network of statutes governing the operation of political parties and elections. At issue in this case are those provisions of Mississippi Code Annotated § 3107 et seq. which require each political party in the state to elect a slate of officers and register its name and party officials with the state. By so doing the political party is granted the exclusive right to use the name registered. The statutes provide that: "No political party shall use or register any name *or part thereof* which has already been registered with the secretary of state by any

---

1. O'Brien v. Brown, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972) and Keane v. National Democratic Party, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1, and 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 73 (1972).

In Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) the Supreme Court upheld the right of the Democratic National Convention to seat a delegation from Illinois which had not been selected in the manner prescribed by state law. The Court reversed a state court injunction barring the Cousins delegates from participating in the 1972 Convention, finding such an injunction to be an unconstitutional restraint on the Cousins delegates' rights of political association, concluding it was a case where ". . . the convention itself [was] the proper forum for determining intra-party disputes as to which delegates [should] be seated." O'Brien v. Brown, 409 U.S. at 4, 92 S.Ct. at 2720; Cousins v. Wigoda, 419 U.S. at 491, 95 S.Ct. 541.

other political part[ies]." § 3107–01. [Emphasis added.]

The plaintiffs in this suit (hereinafter referred to as the Regulars) complied with the terms of this statute in 1950, registering themselves as "The Democratic Party of the State of Mississippi." Their rivals for the use of the title "Democratic Party" (hereinafter referred to as the Loyalists) were formed from the Freedom Democratic Party which had participated in the Democratic National Convention of 1964, attempting unsuccessfully to unseat the delegation of the official Democratic Party. In 1968 this rival faction was seated as the delegation from Mississippi, and thereafter was recognized by the National Democratic Committee as the representative of the National Democratic Party in the state. The two Mississippi delegates to the Democratic National Committee have been selected since 1968 from this second group, and the Loyalists received the call for the 1972 Democratic Convention. This precipitated this suit.

The Regulars brought this action to enjoin the Loyalists from using the name "Democratic Party" in the state, and from participating in the National Democratic Convention of 1972. Joined as party defendants were the National Democratic Party and the Democratic National Committee, both of whom were requested to be enjoined from recognizing the opposing Democratic Party as they had done previously in 1968.[2]

The Loyalists cross-claimed that the National Democratic Party should be enjoined from seating the Regulars, inasmuch as the Regulars were guilty of past racial discrimination; in addition the Loyalists counterclaimed that the Mississippi statute which established the Regulars' right to exclusive use of the name "Democratic Party" was unconstitutional. At this time the Loyalists moved to add as parties the Governor, Secretary of State and Attorney General of Mississippi.[3]

The district court decided that the Regulars were the official, legal "Democratic Party of the State of Mississippi" and the Loyalists had no legal existence. The trial judge declared that the National Democratic Party's rejection of the Regulars in 1968 deprived the "vast majority of Democrats in the state of Mississippi of a voice in the national elections" and accordingly ordered the National Democratic Party to afford the plaintiffs a full opportunity to be heard on the merits of their respective claims to be seated at the 1972 convention.

Following the decision of the 1972 Credentials Committee of the Democratic National Convention to seat the Loyalists, the plaintiffs requested additional injunctive relief. The district court in denying that request noted that while it

**2.** The 1972 official call to the Democratic Convention, issued by the Democratic National Committee to the Loyalists, contained three provisions governing recognition as the official Democratic Party of the state: (1) requisite party loyalty, including support of past presidential and vice presidential nominees; (2) elimination of all racial discrimination in delegate selection; and (3) democratic delegate selection procedures to assure full public participation within the Democratic Party of each state. These standards were essentially similar to those which had been applied in 1968 to unseat the Regulars, and in their place seat the Loyalists as that Democratic organization of Mississippi which complied with the rules and procedures of the Democratic Party.

**3.** The Loyalists subsequently moved to amend their counterclaim to include allegations that

the Secretary of State of Mississippi had denied them due process by denying them a hearing on their request to be registered as the Democratic Party of the state. We do not reach the procedural due process issues in this case, and consequently need not consider whether the denial of this motion to amend was proper as all other constitutional issues which were raised in the amendment were already before the court.

In light of our disposition of the case, it will be unnecessary to consider the claims that the Regulars have continued to deprive black voters in Mississippi of their right to vote, in violation of the First, Fourteenth and Fifteenth Amendments, or to consider whether such discrimination would justify a federal injunction against the seating of such a delegation by a national political party.

was reluctant to attempt to police the conduct of the Democratic National Convention, it did feel that it was within its powers to enforce its finding that the Regulars were the sole official Democratic Party of the state and retained jurisdiction over the case. Thus while the district court denied the requested injunctive relief against the Democratic National Convention, the case presents the possibility of future injunctive relief against the use of the term "Democratic Party" within the state of Mississippi by the defendant Loyalists. The district court dismissed the Loyalists' counterclaims and cross-claims.

Both the Loyalists and the Regulars appeal. The Regulars contend that the district court erred in refusing to enjoin the continued use of the term "Democratic Party" by the Loyalists, while the Loyalists contend that the district court erred in failing to declare that the Mississippi statute granting the Regulars exclusive rights to the terms "Democratic Party" and "Democratic" was unconstitutional. We agree that the Mississippi statute which purports to grant such exclusive rights to the terms "Democratic Party" and "Democratic" was unconstitutional, and accordingly the district court erred in its dismissal of the defendant's counterclaim. We reverse the decision of the district court below which held that the Regulars had a valid claim to the exclusive use of the term "Democratic Party."

## II. JURISDICTION

The Loyalists challenged the district court's subject matter jurisdiction over the Regulars' claims. The Regulars invoked federal jurisdiction under 28 U.S.C. § 1343(1), (3) and (4), stating claims under 42 U.S.C. §§ 1983, 1985(2), and 1973c. In our view the Loyalists' conduct in functioning as a viable political party, holding precinct elections and county nominating conventions, and participating in the national nominating conventions of 1968 and 1972 of the Democratic Party have constituted the performance of such public functions as to give rise to state action for purposes of federal jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983. They complied insofar as they were able with state statutes governing the conduct of precinct elections and local nominating conventions in selecting national convention delegates,[4] and thus they have provided the machinery whereby candidates are nominated for national office. In so doing, their conduct partakes of sufficient state action to justify federal court review. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932). The distinction between primary elections, and nominating conventions has not been held to be of constitutional significance.[5] See, e. g., Gray v. Sand-

---

4. Mississippi Code Ann. § 3107.

The district court held that the Loyalists' actions in changing the times and places of precinct voting for delegates to county delegate conventions from those times and places prescribed by § 3107 of the Mississippi Code constituted a violation of the Voting Rights Act, 42 U.S.C. § 1973c. This holding was erroneous. While it was true that the Loyalists conducted their initial delegate elections at 8:00 p. m. instead of at the 10:00 a. m. as required by the Mississippi statute, and at polling places elsewhere in the communities than those selected in the statute, they did this because they were denied the opportunity to conduct regular precinct voting by the state as they had failed to register as the Democratic Party. Further, the record does not contain evidence sufficient to sustain this charge. The Voting Rights Act, in particular § 1973, was enacted to banish racial discrimination in voting and implement the Fifteenth Amendment. Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); United States v. Mississippi, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). There was no evidence of any racial discrimination by the Loyalists in conducting their delegate selections, and consequently this claim under the Voting Rights Act is meritless.

5. See, generally, Comment, Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions, 78 Yale

ers, 372 U.S. 368, 374–375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Bode v. Nat'l Democratic Party, 146 U.S.App.D.C. 373, 452 F.2d 1302 (1972); State of Georgia v. Nat'l Democratic Party, 145 U.S.App.D.C. 102, 447 F.2d 1271 (1971).

Alternately, we believe that the district court had jurisdiction by virtue of the counterclaim of the Loyalists against the Regulars which clearly stated a cause of action under 42 U.S.C. § 1983 inasmuch as the claim involved the contention that the state statute unconstitutionally granted the Regulars exclusive rights to the title "Democratic Party." *See,* Haberman v. Equitable Life Assurance Society of U. S., 224 F.2d 401 (5th Cir. 1955).

## II. THREE–JUDGE COURT

█ Part of the counterclaim of the Loyalists involved a request for injunctive relief against enforcement of the Mississippi statute, § 3107 et seq., and as such would be improperly considered by a single judge under 28 U.S.C. § 2281. That part of the counterclaim which requested a declaration that Mississippi Code Ann. § 3107 et seq. is unconstitutional on its face, however, can be considered without a statutory three-judge court inasmuch as only declaratory relief was requested. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 152–155, 83 S.Ct. 554, 9 L.Ed.2d 644 (1962); Triple A. Realty, Inc. v. Florida Real Estate Comm., 468 F.2d 245, 246 (5th Cir. 1972).

## IV. CONSTITUTIONALITY OF STATE REGULATION OF USE OF NAME "DEMOCRATIC PARTY."

It is undisputed that the use of the name "Democratic Party" has substan-

tial value; both parties earnestly seek to have their right to use the name established by this Court. The Regulars argue in their brief that "the political label alone carries with it thousands of votes that might go for another candidate if the party affiliation of the candidates were not known." In our view the value goes beyond the effect the term "Democratic Party" has on ignorant or undecided voters, for it permits a group to identify itself with an historical tradition, a national and regional political organization, and a well-established structure to facilitate fund-raising.[6] We thus begin our review of the constitutional issues involved in the state's attempt to regulate the use of a party name by explicitly recognizing that a denial of the use of any name incorporating "Democratic" has the potential for substantial political effect.

Denying the Regulars the exclusive use of the name to which it had become accustomed prior to 1968, or conversely upholding the right of the state to refuse the Loyalists access to the name "or any part thereof" is a decision which has potential serious impact on each group's political fortunes. We do not accept the view argued by the Regulars that the fact that the Loyalists are not prohibited from participating in the political process, or appearing on the ballot under some other name, thereby vitiates any claim the Loyalists might have that a denial of the use of the word "Democratic" in their name has an effect on their ability to function as a political party.

The statute expressly provides that "the purpose of this act is to provide additional remedies for the protection of the political parties of this state," § 3107–3109, and we assume that the statute has the effect of protecting the

---

L.J. 1228, 1234 (1969); Comment, One Man, One Vote and Selection of Delegates to National Nominating Conventions, 37 U.Chi.L. Rev. 536 (1970); Comment, Freedom of Association in the Selection of Delegates to National Political Conventions, 56 Cornell L.Rev. 148 (1970).

**6.** Other courts have similarly recognized the importance of the right to a party name, emblem or insignia. *See, e. g.,* Soule v. Martin, 252 La. 851, 214 So.2d 538 (1968); Chambers v. I. Ben Greenman Association, 58 N.Y.S.2d 637 (App.Div.1945); affirmed 58 N.Y.S.2d 3, 269 App.Div. 938 (1945); State ex rel. Cook v. Houser, 122 Wis. 534, 100 N.W. 964 (1904).

officially recognized Democratic Party organization. By virtually enshrining the pre-existing Democratic Party of the state as the sole and only *official* Democratic Party entitled to function in Mississippi, the state thereby creates substantial obstacles to the ability of new Democratic organizations to grow and function—and, as the Regulars readily concede, the "official" Democratic organization may gain substantial support solely by the use of the name. Both groups have serious claim to the title "Democratic Party:" one is admittedly the established and well-organized party on the state level, the other has gained national recognition by two national nominating conventions and the Democratic National Committee and has begun to develop a statewide organization.[7] It is impossible to view one or the other of the two groups as a sham organization, or one that frivolously seeks to use a name for the sole purpose of confusion or deception.

The ultimate success of one or the other of these two groups will depend upon political processes removed from any remedy a federal court can offer; in our view this as as it should be. We are reluctant to interfere with this intrinsically *political* conflict between the two groups. Our primary concern is that through its registration statute the state of Mississippi has intervened in an impermissible way on behalf of one of the two groups and thereby interfered with the political process through which the two dissident factions of the Democratic Party will work out their relationship with each other.

■■■■ Substantial burdens on the right to vote or to associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In our view there can be no serious doubt that the grant of exclusive rights to the name "Democratic Party" or the title "Democratic" by the state of Mississippi constitutes a substantial burden on the ability of the Loyalists to organize in the state. To justify the imposition of a burden on the opportunity to organize for political purposes the state must demonstrate a compelling interest in the purpose of that regulation. While the burden placed on the Loyalists is not so great as total exclusion from the ballot, we do not understand this to be the sole litmus test for evaluating a constitutional challenge to restraints on the ability to organize as a political party. Rather, if the statute under attack constitutes a "substantial restraint," NAACP v. Alabama, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), or a "significant interference," Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1959), with the exercise of a constitutionally protected right of free association, the statute constitutes a sufficient restraint to trigger strict constitutional scrutiny. Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975); Kusper v. Pontikes, 414 U.S. 51, 58, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

■■■■ While it is true that the administration of the electoral process is a matter that the Constitution largely entrusts to the states, Art. I, § 2, Art. II, § 1, in exercising their powers of supervision over elections "the states may not infringe upon basic constitutional protec-

7. The extent to which the Loyalists had organized party structures throughout the state of Mississippi was disputed at trial, and the trial court made no specific findings of fact on the issue. See 344 F.Supp. 908, 915 (S.D. Miss.1972). The Loyalists claim party organization within 67 of the 82 counties in Mississippi, while the Regulars contend that the actual number is between 15 and 31. For the purposes of this opinion it is unnecessary that we attempt to resolve this conflict in the testimony.

tions," and "unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." Kusper v. Pontikes, 414 U.S. at 57, 94 S.Ct. at 307. "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 449, 94 S.Ct. 656, 662, 38 L.Ed.2d 635 (1974); Williams v. Rhodes, 393 U.S. at 30, 89 S.Ct. 5. "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957); Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541.

 Some state restrictions on the ability to organize a political party have been upheld by the Supreme Court, but only in those instances where the state statute "furthers the State's interest in the stability of its political system." Storer v. Brown, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974). There is little doubt as to the correct standard of review: "A significant encroachment upon associational freedom cannot be justified upon a mere showing of legitimate state interest." Bates v. Little Rock, 361 U.S. at 524, 80 S.Ct. 412; NAACP v. Alabama, 357 U.S. at 463, 78 S.Ct. 1163; Kusper v. Pontikes, 414 U.S. at 58, 94 S.Ct. 303. In those instances where state limitations have been upheld, it has been manifest that the state electoral regulations serve some fundamental interest. As the Supreme Court has said:

"As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive and in many respects complex election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualification of voters, and the selection and qualification of candidates." Storer v. Brown, 415 U.S. at 731, 94 S.Ct. at 1279.

Several such provisions governing the conduct of primary elections have been recently upheld. In Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) the Court upheld a New York statute requiring a voter to register as a party member 30 days prior to the previous general election to vote in the subsequent party primary. A short time later the Court struck down similar provisions limiting access to participation in party primaries imposed by an Illinois statute, where the deadline for changing party registration was 23 months prior to the primary date. Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). In both instances the states asserted an interest in preventing cross-over voting in party primaries, which would allegedly have the effect of permitting members of one political party to affect the primary elections of another. In Kusper v. Pontikes, however, the Court held that the method the state used to approach a solution to the problem was so burdensome on individual voters as to constitute too severe a restriction on the constitutional right to participate in the political party of one's choice.[8]

In this case the state of Mississippi asserts an interest in avoiding voter confusion caused by having more than one party using the word "Democratic" in its name. In our view this interest doesn't rise to the level of a goal so fundamental as to be essential to maintaining the stability of the state's electoral system nor could the method chosen to accomplish this goal pass constitutional muster, "for even when pursuing a legitimate inter-

---

8. *See also*, Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) for other recent application of these standards to other forms of regulation of primary elections.

est, a State may not choose means that unnecessarily restrict constitutionally protected liberty." Kusper v. Pontikes, 414 U.S. at 59, 94 S.Ct. at 308; Dunn v. Blumstein, 405 U.S. at 343, 92 S.Ct. 995. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Here we have little doubt that the state of Mississippi has open to it "a less drastic way" of satisfying its interest in avoiding voter confusion, and thus we conclude "it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." Kusper v. Pontikes, 414 U.S. at 59, 94 S.Ct. at 308; Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

While the avoidance of voter confusion is a worthwhile objective, and possibly even fundamental and compelling if the means chosen are sufficiently precise and narrow—here the restriction is both unnecessarily broad as well as arguably ineffective. Denying the Loyalists the use of the name "Democratic" may often lead to confusion among the voters, not lessen it. It cannot be doubted that the Loyalists have some valid claim to be thought of as part of the Democratic Party: they are recognized as the Democratic Party of the state by the Democratic National Committee, they have been twice seated at the Democratic National Convention, and they select representatives to the Democratic National Committee from the state. It seems to us self-evident that some voters voting for a member of the Regulars might easily be misled into thinking that he was in some way participating in the affairs of the National Democratic Party.

It seems to us the proper course is for the political process to solve this problem—and that solution is not to try to ignore that factionalism in the state exists, but rather for the two factions to have the opportunity to pursue their own political objectives without undue hindrance by the state. It seems to us the grossest sophistry to argue that because some voters in the state might not be able to distinguish between a group labelling itself the Regular Democratic Party, and one designating itself the National Democratic Party (or some such other distinguishing title) that this inability to distinguish between two very different political organizations should necessarily mean that one group of Mississippi Democrats should be denied the right to take part in the politics of the Democratic Party, or that it should be unable to assert its interest in the Democratic Party and accurately represent to the voters of the state its role in national Democratic politics—thereby leading to more efficient fund-raising and organizing.[9]

In a sense, the seriousness with which one approaches the constitutional issues in this case will depend on just how significant he perceives the restraint to be on the Loyalists' ability to organize were they to be unable to use the title "Democratic Party." Oddly this is the one argument that the Regulars cannot make consistent with their position that their claim to the title "Democratic Party" is vital to their own protection under the Constitution, and that to deny them the opportunity to be the only Democratic Party in the state in some way affects their ability to organize effectively. In our view the opportunity to label one's group as part of the Democratic Party has meaning, both to active party members and to the voters—not because voters are unable to discern which group of the Democratic Party constitutes the Regular faction or the Loyalists faction,

---

9. The state has a valid interest in preventing two different parties from appearing on the ballot under the identical name, thereby making it impossible for voters to distinguish between opposing parties. In accomplishing this goal, the state may grant a registrant the exclusive right to the precise name registered; it may not, however, prevent the use of that title, when used in some sufficiently different form, by another party. Thus, in this case, the initial registrant of the name "The Democratic Party of the state of Mississippi" may continue to so refer to itself, but the state may not prohibit the use of the word "Democratic" when another party seeks to use that as part of its party name.

but because in our view the parties to this action assume that there is a difference between Democrats and members of other political parties. Presumably this difference goes beyond mere labels and symbols to matters of substance.

To the extent then that there is meaning to the term "Democratic Party," and to the extent that the ability to use the term affects party organization, party contributions, and party loyalty, we believe that the state's attempt to deprive the Loyalists of the opportunity to describe themselves on the ballot as part of the Democratic Party is an unconstitutional and impermissible restraint on the Loyalists' constitutional guarantees of free association. No state interest has been argued which in any way justifies this type of intrusion into free party organization, and accordingly we conclude that the part of the Mississippi Code which regulates the use of party labels by granting the party first to register a particular name the exclusive rights to every part of the name registered is unconstitutional.

Reversed and remanded for proceedings not inconsistent with this opinion.