**SOCIALIST WORKERS PARTY et al., Plaintiffs,**

v.

**CHICAGO BOARD OF ELECTION COMMISSIONERS et al., Defendants.**

**Gerald ROSE et al., Plaintiffs,**

v.

**John H. HANLY et al., Defendants.**

Nos. 77 C 255, 77 C 326.

United States District Court, N. D. Illinois, E. D.

March 14, 1977.

Lance Haddix, Chicago, Ill., Ron Reosti, Detroit, Mich., for plaintiffs in No. 77 C 255.

John B. McCauley, Asst. Corp. Counsel, Chicago, Ill., for defendant Marcin.

Ian H. Levin, Foran, Wiss & Schultz, Michael Levinson, Chicago, Ill., for defendant Chicago Bd. of Election Commissioners and Ill. State Bd. of Elections.

William H. Luking, Jeffrey D. Colman and Jayne W. Barnard, Jenner & Block, Chicago, Ill., for plaintiffs in No. 77 C 326.

Ian H. Levin, Foran, Wiss & Schultz, Chicago, Ill., for defendants in No. 77 C 326.

### MEMORANDUM OPINION

DECKER, District Judge.

*I. Background*

A special mayoral election has been scheduled for June 7, 1977, in Chicago to fill the vacancy caused by the death of the late mayor, Richard J. Daley. On January 13, 1977, the defendant in these two cases, the Chicago Board of Election Commissioners,[1] released the election calendar for this election. Among its specifics, it set the filing dates and signature requirements for petitions for independent candidates for mayor,[2] and for new political parties,[3] i. e., parties other than the Democratic and Republican parties.

The defendants purported to follow the statutory requirements of the Illinois Election Code, Ill.Rev.Stat. ch. 46. Following Ill.Rev.Stat. ch. 46 § 10–6, they set the filing deadline for new political parties on April 4th, 64 days prior to the election. The filing date for independents was initially set on February 19th, the same day as required for candidates in the major party primaries.[4]

The pertinent language regarding signature requirements in § 10–2, applying to new parties, and § 10–3, applying to independents, is identical:

"not less than 5% of the number of voters who voted at the next preceding general election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." [5]

Nonetheless, the defendants used the voting figures from the April 1, 1975, mayoral election to compute the requirement for independents, and used figures from the November 2, 1976, general election to determine the requirement for new political parties. Thus, the defendants required that new political parties had to contain 63,373 valid signatures on their petitions, while independents were only required to present petitions with 35,947 signatures.[6]

These two suits were filed by supporters of new political parties and independent candidates seeking access to the ballot to challenge the constitutionality of the Board's determinations.

Case No. 77 C 255 was brought by the Socialist Workers Party and challenges in its first two counts the signature requirements and filing deadlines set for new political parties. Case No. 77 C 326 was brought by the United States Labor Party, and by Gerald Rose, an individual who alleges that he desires to run as an independent in the mayoral election.[7] This case challenges the requirements set out for both new parties

---

1. In No. 77 C 255 the members of the State Board of Elections, and John Marcin, the City Clerk of Chicago, are also named as defendants, as are the two boards in their corporate capacities.

2. Independents are defined in Ill.Rev.Stat. ch. 46 § 10–3 as candidates who are "not candidates of any political party".

3. A new political party is any political group which seeks to become an "established political party" but which did not poll more than 5% of the entire vote cast within the political unit at the last election in which that unit voted to elect officers to serve its respective territorial area. A long-standing political party such as the plaintiff Socialist Workers Party may be classified as a "new political party" because of lack of electoral success.

4. The primary is scheduled for April 19, 1977.

5. The two sections differ only in that § 10–3 also establishes an 8% signature ceiling for the petitions of independents, and that § 10–2 refers to 5% of the number of "voters" who voted in contrast to § 10–3, which refers to 5% of the number of "persons" who voted.

6. The requirements for candidates in the major party primaries are calculated on a different basis. Democratic candidates need 4,460 signatures and Republican candidates 2,558 signatures.

7. Individuals asserting that they support these parties and candidates are also named as plaintiffs.

and independents. *Rose v. Hanly* was brought before this court as related to the earlier filed case. Although the two have not been formally consolidated, they raise essentially overlapping factual and legal issues, and the defendants have filed an identical reply brief in support of both of their motions to dismiss.

In the course of this litigation the defendants have agreed, for the purposes of this special election, to modify these requirements. Independent candidates are now given an extension until April 4th, the deadline set for new parties, to file their petitions. And new political parties are only to be required to submit 35,947 valid signatures, the same amount as required of the independents. Thus, the signature requirements and filing deadlines are now identical for independents and new political parties in the forthcoming election.

Both cases seek injunctive and declaratory relief. As noted, there are pending motions to dismiss in both actions, and both sets of plaintiffs have briefed motions for injunctive relief.

## II. Justiciability and the Effect of Recent Supreme Court Cases on Equal Protection

Defendants have not raised any challenge to the justiciability of an election law challenge as a political question. This defense has been clearly rejected by the Supreme Court. *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Wesberry v. Sanders,* 376 U.S. 1, 5–7, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Baker v. Carr,* 369 U.S. 186, 208–237, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

They do, however, argue that the plaintiffs cannot challenge their implementation of the state statutes where it cannot be shown that there was any purposeful invidious discrimination. They cite the statement of the Seventh Circuit that

> "To establish a denial of equal protection a candidate for public office must [allege and] prove the existence of an intentional or purposeful discrimination by the election authorities in which one class is fa-

vored over another." *Baum v. Lunding,* 535 F.2d 1016, 1018 (7th Cir. 1976).

*Baum,* however, dealt with a challenge to a regulation which authorized group petitions for candidates seeking to run together as a "slate". However, after consideration of the merits of plaintiff's claim, the Seventh Circuit found that the regulation was not in fact discriminatory against individual candidates, and was based on justifiable policy grounds. It sustained the trial court's conclusion that the complaint was frivolous. Neither *Baum,* nor *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970), also cited by the defendants, deals with claims of discriminatory rules regarding ballot access. Such challenges have been repeatedly brought under the equal protection clause, including *Jackson v. Ogilvie,* 325 F.Supp. 864 (N.D.Ill. 1971), the case upon which the Board's defense is focused. See also the numerous cases dealing with similar challenges, cited *infra.*

Going beyond these cases, the defendants argue that the recent Supreme Court cases of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), have established discriminatory intent as an element of all equal protection based claims. *Arlington Heights* states that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." at 265, 97 S.Ct. at 563.

Both of these cases dealt with situations in which officials effected policies which had a discriminatory impact. The Court felt that this was insufficient to sustain a case for denial of equal protection in the absence of "proof that a discriminatory purpose has been a motivating factor in the decision." at 265–266, 97 S.Ct. at 563.

These cases may be distinguished on several grounds. First, the defendants in *Washington v. Davis* and *Arlington Heights* were able to show that they disregarded racial considerations and considered matters relating solely to job qualifications in hiring

and community needs in zoning. However, in the instant case, the challenged policy was the implementation of a law designed to discriminate against frivolous candidacies and parties. The challenged portions of the Election Code are deliberately structured to deny access to the ballot to certain members of the classification in which the plaintiffs are placed by the law. The racial impact in the two Supreme Court cases was found to be incidental;[8] the special burdens placed upon the defendants' classes and challenged in these cases are the central point of the statutory scheme.[9]

That these special requirements are more onerous than those placed upon major party candidates or statewide candidates does not per se prove a violation of equal protection, but it does put into issue the reasonableness of the classifications and the burdens.

Furthermore, the defendants ignore the fact that the instant cases assert due process claims raising first amendment issues. Defendants are in error when they assert that questions of ballot access are cognizable only under the equal protection clause. In Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the court was faced with a challenge to Ohio's statutory scheme for qualifying third parties on the ballot. The court noted

> "the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the

Fourteenth Amendment to the same protection from infringement by the States." 393 U.S. at 30–31, 89 S.Ct. at 10.

Since Williams courts have repeatedly considered the First Amendment claims raised by challenges to state ballot laws. American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Riddell v. National Democratic Party, 508 F.2d 770 (5th Cir. 1975); Smith v. Cherry, 489 F.2d 1098 (7th Cir. 1973); McCarthy v. Kirkpatrick, 420 F.Supp. 366 (W.D.Mo.1976); Bendinger v. Ogilvie, 335 F.Supp. 572 (N.D.Ill.1971); Jackson v. Ogilvie, supra.

### III. Ripeness

■ Noting that the deadlines for filing petitions have not yet passed, the defendants assert that this action is not yet ripe. They contend that there is no real controversy at present, and that plaintiffs are in fact seeking an advisory opinion from the court.

The plaintiffs counter by stressing that they are currently forced to expend their political resources in an effort to satisfy what they feel are unconstitutional requirements. They thus claim to suffer an immediate injury.

The defendants' own brief reveals that the courts have considered this type of situation to raise a controversy ripe for judicial determination. They note that the pertinent filing deadline for the mayoral election in Jackson v. Ogilvie, supra, was February 1, 1971. The plaintiff filed his case on December 10, 1970, two months before the deadline. The three-judge court considered that case and entered its decision on January 28th, also prior to the filing date. There is no reason why this court should not similarly entertain this case.

8. It is also arguable that these cases are limited to equal protection claims involving alleged racial discrimination.

9. This action must be viewed as an attack on the constitutionality of the applicable portions of the Illinois Election Code. The named de-

fendants are those who have the duty of implementing the challenged statutes. In dealing with the essential legal issues, the absence of animus on the part of the individual defendants is not dispositive of the constitutional questions.

## IV. Standard of Review

The numerous cases that have entailed consideration of state ballot access laws have focused upon the balance of the interests of the plaintiffs in effectively participating in the electoral process, and furthering their desires to express their political beliefs through political associations, against certain state concerns in regulating the electoral process. In *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), the Court expressed some of these state concerns:

> "That 'laundry list' ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion. The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not. Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success." 415 U.S. at 715–16, 94 S.Ct. at 1319.

In *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972), the Court expressed concern for the state need to "prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." The Court spoke in *Storer v. Brown, supra,* of the state interest "in encouraging compromise and political stability." 415 U.S. at 729, 94 S.Ct. at 1278. The Supreme Court has therefore upheld properly drawn statutes that seek to require "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness v. Fortson, supra,* 403 U.S. at 442, 91 S.Ct. at 1976.

The contrasting concerns of the plaintiffs are well described in the passage from *Williams v. Rhodes,* quoted *supra.* The basic political rights of free speech and free association, and free exercise of the franchise need no further amplification. It should not be ignored that third party candidates and programs have had significant impact on our history and political values, even when the electoral campaigns themselves were unsuccessful.[10] Access to the ballot is a threshold means for general consideration of the ideas espoused by these parties and candidates. Nor can it be ignored that one of our current major parties was itself originally a minor political group. Finally, there has been much concern expressed recently over the substantial portion of the electorate that has failed to exercise its franchise in preceding elections. This absenteeism may itself reflect discouragement with the range of choices on the ballot, or a desire for an effective means of casting a protest vote.

Where such important rights are to be balanced against regulations purporting to protect significant state interests, this court has stressed that

> "[b]efore a state can place any restrictions upon the freedom to associate freely and to vote, it must be shown that a compelling state interest justifies such regulation." *Bendinger v. Ogilvie, supra,* at 574.

This means that the court is to subject the challenged portions of the Election Code to "strict scrutiny". As was recently said in *McCarthy v. Kirkpatrick, supra,* at 373:

> "While the state has a legitimate interest in restricting access to the ballot in order to maintain the integrity of the ballot and preserve an orderly election process, the Supreme Court has required that the means chosen by the state to achieve its goals be carefully scrutinized, for they necessarily place burdens on the right of individuals to associate for the advance-

---

**10.** Electorally unsuccessful parties whose platforms have greatly affected American life include the Free Soil Party, Populist Party, Prohibitionist Party, Socialist Party and several manifestations of the Progressive Party.

ment of political beliefs, and the rights of qualified voters to cast their votes effectively."

A review of ballot access cases reveals that the courts have consistently expressed their determination to apply this more rigorous form of constitutional analysis. *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972);[11] *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Riddell v. National Democratic Party,* 508 F.2d 770 (5th Cir. 1975); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970); *Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975); *Lawlor v. Board of Election Commissioners,* 395 F.Supp. 692 (N.D.Ill.1975); *Lendall v. Bryant,* 387 F.Supp. 397 (E.D.Ark.1975); *Jackson v. Ogilvie,* 325 F.Supp. 864 (N.D.Ill. 1971).

### V. The 35,947 Signature Requirement

■ As noted, the defendants have determined that independents and new political parties must obtain 35,947 valid signatures on their petitions in order to qualify for the special mayoral ballot.[12] They assert that this is derived from the statutory requirement of 5% of the voters at the last general election at which Chicago voters voted as a unit for a city office.

The defendants maintain that they are merely complying with the law, and emphasize that a three-judge court sustained the 5% requirement in *Jackson v. Ogilvie, supra.*

*Jackson* was brought by an independent candidate in the 1971 regular mayoral election, and challenged the signature requirements in Ill.Rev.Stat. ch. 46, § 10–3, as well as the filing deadlines set in § 10–4. The majority opinion, supported by Judge Lynch and Judge Perry, held that

"[w]hile the 5% requirement is higher than the percentage required in a majority of other states (see *Williams v. Rhodes supra,* 393 U.S. 33 n. 9, 89 S.Ct. 5) nonetheless we feel it is a reasonable limitation that serves a compelling state interest." 325 F.Supp. at 868.

A vigorous dissent by Judge Pell noted that no evidentiary hearing had been held to prove the compelling state interest, and concluded, "I am unable to agree nor can I conceive that there is a real possibility of demonstration supporting a compelling state interest in adherence to the 5% restrictive requirement." 325 F.Supp. at 869.

While the defendants argue that the majority opinion is dispositive of these issues, the plaintiffs argue that *Jackson* can be factually distinguished from the instant circumstances.

Essentially this argument is based on the distinction between a regular election and a special election. They note that a candidate or party seeking ballot position in a regular election can begin preparations for signature gathering well in advance of the deadline. The date for the election is known well in advance, and there is no barrier to early circulation of petitions.

By contrast, the need for a special election only materialized on December 20,

---

11. While there is language in *Bullock v. Carter* to the effect that challenges to ballot barriers do not *per se* require strict scrutiny, 405 U.S. at 143, 92 S.Ct. 849, the Court did apply that standard. *See Salera v. Tucker,* 399 F.Supp. 1258, 1263, n. 5 (E.D.Pa.1975).

12. Since the defendants have agreed not to apply the 63,373 signature requirement, derived from the 1976 election figures, for new parties, and since the court has made its own determination of the validity of the lesser 35,-947 requirement, derived from the 1975 mayoral election figures, the issue of the constitutionality of utilizing disparate statistics to satisfy identical statutory requirements is essentially moot. However, it should be noted that *Jackson v. Ogilvie, supra,* construed the statute as requiring 5% "of the total number of votes which were cast in *the last preceding election for the office he currently seeks.*" 325 F.Supp. at 866. Furthermore, since Cook County Circuit Judges from Chicago "serve" a judicial district covering all of Cook County, the 1976 elections did not select officeholders serving any district limited to Chicago. There is, therefore, no apparent statutory basis, nor any logical reason to impose a more severe burden on new parties than independents, or to calculate the 5% requirement on the basis of non-municipal election figures.

1976, when Mayor Daley died. Petitions could not be circulated prior to January 13, the date on which the election was fixed. Thus these plaintiffs have only from January 13 to April 4, 81 days, to obtain the needed signatures.

The unique circumstances created by a special election do, of course, change the context in which the appropriateness of these ballot barriers is to be evaluated. In a case raising slightly different issues, the Illinois Supreme Court has acknowledged that

> "[i]n filling vacancies in office by special primary and election, there must be room for an expansion and contraction of time tables which are observed in the regular election procedure." *People ex rel. Adamowski v. Kerner,* 19 Ill.2d 506, 514, 167 N.E.2d 555, 563 (1960).

More importantly, the United States Supreme Court has repeatedly emphasized that the constitutionality of these types of restrictions must be evaluated upon a situation by situation basis. In *Storer v. Brown, supra,* it was stated:

> "[T]he rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree,' *Dunn v. Blumstein, supra,* 403 U.S. at 348, 92 S.Ct. [995], at 1006, very much a matter of 'consider[ing] the facts and circumstances behind the law, the interest which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' *Williams v. Rhodes, supra,* 393 U.S. at 30, 89 S.Ct. [5] at 10; *Dunn v. Blumstein, supra,* 403 U.S. at 335, 92 S.Ct. [995] at 999. What the result of this process will be in any specif-

ic case may be very difficult to predict with great assurance." 415 U.S. at 730, 94 S.Ct. at 1279.

Similarly, in *Jenness v. Fortson, supra,* 403 U.S. at 437, 91 S.Ct. 1970, the Court emphasized the analysis of *Williams v. Rhodes, supra,* which demanded a study of "the totality" of the challenged election laws.

The validity of a signature requirement cannot be analyzed, therefore, without consideration of the circumstances and time-frame within which the petitions may be circulated.[13] In this vein, the court in *Lendall v. Bryant, supra,* at 402, noted that "[the signature requirement and the filing deadline] reinforce each other in interdicting independent candidacies . . . ."

While the court in *Jackson v. Ogilvie, supra,* considered the validity of a 5% signature requirement and a filing deadline 64 days prior to the election, it did not do so in the circumstances of a constricted period for circulating petitions. This in itself, denies *Jackson* any *stare decisis* effect in this action, and leaves the Election Code open to challenge in the context of a special mayoral primary.

Furthermore, since there is no "litmus-paper" test for the validity of ballot-barriers, there is a need for some judicial examination of evidence pertaining to the scope of the burden created by the election laws. In *Storer v. Brown, supra,* 415 U.S. at 738, 94 S.Ct. at 1283, the Court stated that "[w]e must, therefore, inquire as to the nature, extent, and likely impact of the California requirements." In the absence of such evidence, the court vacated the judgment and remanded the case to the district court "for further proceedings to determine whether the California election laws place an unconstitutional burden on [plaintiffs'] access to the ballot."

*Jackson v. Ogilvie, supra,* was decided prior to *Storer.* The dissent by Judge Pell noted that "no evidentiary hearing has been held." 325 F.Supp. at 869. The analysis of

---

**13.** In *Storer v. Brown* the court questioned whether there was any compelling state interest in requiring the collecting of signatures in a limited 24 day period, where the quota was itself substantial. 415 U.S. at 743, 94 S.Ct. 1274.

the majority was done *in vacuo*,[14] without any explanation for the finding that "[5%] is a reasonable limitation that serves a compelling state interest."

In *Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975), cited by the defendants, the court ruled unconstitutional a portion of the Pennsylvania election code previously sustained by an earlier three-judge court decision. Without challenging the correctness of the prior case, the court nonetheless decided "that the factual situation in our case warrants a different conclusion." 399 F.Supp. at 1268. Similarly, the instant cases, as noted *supra,* present a different factual context than *Jackson.* Since *Jackson* also failed to examine the factual situation to see whether the Illinois statutes created "burdens so severe as to confer an effective political monopoly on the two major parties," *Storer v. Brown,* 415 U.S. at 729, 94 S.Ct. at 1278, there is a definite need to examine the current political realities in Chicago to see whether these cases, too, "[warrant] a different conclusion."

The defendants also argue that requirements as stringent as those posed by the Illinois statutes have been frequently upheld by the courts. However, a review of these cases does not persuade the court that a 5% requirement is constitutional *per se.*

It is true that there is language in *Storer v. Brown, supra,* at 740, 94 S.Ct. at 1284, stating that "[s]tanding alone, gathering 325,000 signatures in 24 days [statewide in California in support of an independent presidential candidacy] would not appear to be an impossible burden." The California statute, like the Illinois regulation at issue before this court, calculated the 5% figure on the basis of the votes cast at the preceding general election rather than the total of registered voters. It may have been harsher than the Illinois statute by excluding

those who voted in the primary from signing the petitions.[15]

On the other hand the Court remanded *Storer* for a hearing to clarify the factual context of the statute. It was concerned, among other issues, with ascertaining whether "*in the context of California politics,* could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742, 94 S.Ct. at 1285 (Emphasis added). The court mentioned the value of determining whether in the past "candidates have qualified with some regularity."

In *Jenness v. Fortson, supra,* the court also upheld a 5% signature requirement. While the 5% figure was based on the larger total of registered voters, rather than votes cast, in the last election, Georgia law permitted voters to sign more than one petition, and to both sign petitions and vote in the primary. Furthermore, candidates had 180 days in which to gather the signatures. The court's conclusion that the Georgia law did "not operate to freeze the political status quo", 403 U.S. at 438, 91 S.Ct. at 1974, also relied on a stipulation of facts revealing that the nominating petition route had been employed successfully by recent candidates for governor and President.

Similarly, in *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the court noted that two of the original party plaintiffs had satisfied the challenged petition requirements. Furthermore, the requirements were not as severe as those in issue in the instant cases. Texas required 1% of the vote for governor at the last general election to obtain statewide ballot position for minor parties. A

---

**14.** Indeed the only data cited in *Jackson* relating to the necessity for the 5% requirement cuts against the majority's conclusions. The majority noted that this requirement "is higher than the percentage required in a majority of other states"; Judge Pell called this an understatement, noting that 46 states were more lenient than Illinois.

**15.** The defendants note than 35,947 actually represents only 2.1% of the electorate. This discrepancy reflects the low turnout at the last mayoral election. The parties have not clarified to the court their view of the effect signing a petition for a new party or an independent has on the ability of a voter to sign other petitions, or vote in the primary.

period of 55 days was allowed to circulate the petitions. Independent candidates had to satisfy a signature requirement of 3% to 5%. However, the smaller percentage applied to larger units such as a congressional district, and there was a 500 vote maximum requirement.

The court has before it little information upon which it might hazard a judgment whether the challenged election laws unconstitutionally operate as an exclusionary device structured to "freeze the status quo", particularly in the context of a special Chicago mayoral election. The plaintiff Socialist Workers Party did manage to satisfy the 41,403 signature requirement for the 1975 mayoral election. Still, this was achieved without the more stringent time limitations affecting the current election. There is no evidence that any other independent or third party candidate has ever satisfied the 5% test for a Chicago cite-wide election.

The evidence presently before the court makes it impossible to establish the maximum signature requirement within the toleration of the Constitution. Nonetheless, it may be held with certainty that this requirement can in no event exceed 25,000.

Both § 10–2 and § 10–3, which establish the 5% requirement for ballot access for less than statewide elections, also contain provisions that petitions containing 25,000 signatures will be sufficient to obtain ballot placing for statewide races. These signatures may be obtained exclusively in one county, or even in one city. *Communist Party of Illinois v. State Board of Elections,* 518 F.2d 517 (7th Cir. 1975). The plaintiffs argue that the distinction between the statewide requirements and the 35,947 quote for Chicago mayoral petitions is an irrational denial of equal protection for participants in Chicago municipal elections.

The defendants counter that the contrast with the 25,000 requirement was considered in *Jackson v. Ogilvie, supra.* However, it appears that it was only referred to in passing in one sentence of a brief submitted by the defendants in that case. There is no discussion of this issue whatsoever in either the majority opinion or in the dissent. In

such a situation there is little reason for this court to hesitate to re-evaluate an important contention. This is particularly true where it is raised in the different factual context of the forthcoming special election. *Salera v. Tucker, supra.*

One of the most fundamental principles of constitutional analysis is that

"even though the governmental purpose be legitimate and substantial, the purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

The need to apply the "least restrictive alternative" has been applied by the Supreme Court to election law challenges:

"If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes,* 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).

The Seventh Circuit stressed this requirement in *Briscoe v. Kusper,* 435 F.2d 1046, 1054 (7th Cir. 1970), where it held:

"This state concern . . . may well call for limitations on access to ballots by those seeking public office. . . . Assuming the constitutional legitimacy of such an objective, due process nevertheless requires that the state accomplish that end narrowly and fairly to avoid obstructing and diluting these fundamental liberties."

In *Lendall v. Bryant,* 387 F.Supp. 397, 402 (E.D.Ark.1975), the court wrote that

"a State may regulate and to some extent restrict the access of independent candidates to the ballot . . . However, the measures adopted by the State must not go beyond what the State's compelling interests actually require, and broad and stringent requirements or restrictions with respect to would-be independent candidates cannot stand where more moderate ones would do as well."

This court made the same point in *Bendinger v. Ogilvie*, 335 F.Supp. 572, 575 (N.D. Ill.1971), when it pointed out that

> "it must be shown that the state statute in question is not only as fair as possible, but also that it infringes upon the First Amendment rights of those affected as little as practicable under the circumstances."

*See also, Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Williams v. Rhodes, supra; Riddell v. National Democratic Party, supra.*

In drafting the requirement for statewide races, it must be assumed that the legislature determined the minimum showing of adherents necessary to satisfy the state interest in screening out frivolous candidacies. The legislature found that 25,000 signatures would demonstrate the needed "modicum of support". Presumably the 5% requirement was drafted out of concern for smaller election districts, where 25,000 voters would be a disproportionate share of the electorate. The size of Chicago and Cook County, however, create the anomaly that 25,000 signatures may fall short of the 5% requirement.

It is not necessary to determine whether this legislative draftsmanship reflects carelessness or solicitude for the interests of the major parties in Cook County and Chicago. The court cannot find any rational reason why a petition with identical signatures can satisfy the legitimate state interests for restricting ballot access in state elections, and yet fail to do the same in a lesser unit. *Lendall v. Jernigan*, 424 F.Supp. 951 (E.D. Ark.1977). Any greater requirement than 25,000 signatures cannot be said to be the least drastic means of accomplishing the state's goals, and must be found to unduly impinge the constitutional rights of independents, new political parties, and their adherents.[16]

### VII. The April 4 Filing Deadline

As noted, the defendants have agreed to set April 4, 1977, as the filing deadline for petitions for both independents and new political parties.[17] This date is 64 days prior to the special mayoral election, and comes 15 days before the major party primaries.

The plaintiffs' attack on this time frame has two thrusts. First, they argue that the 81 days it allows for circulation of petitions is insufficient. Second, they claim that a pre-primary deadline is too far removed from the election and forces them to attempt to secure signatures in a political vacuum.

Unlike the election codes of other states such as Pennsylvania, Texas and California, the Illinois election laws do not normally confine the circulation of petitions to any restricted period. The circumstance of a finite 81-day period arises solely because the unexpected need for a special election in effect created an "opening date" for petition gathering. Thus this issue does raise a challenge to the normal functioning of the Illinois statute.

This opinion has already stressed that the constitutionality of a ballot access restriction cannot be properly decided without consideration of the effect of the total regulatory scheme. As a consequence, the appropriateness of an 81-day period is affected by this court's determination that no more than 25,000 signatures need be obtained by plaintiff parties and candidates.

■ An 81-day circulation period for the collection of 25,000 or even fewer signatures appears to be within the limits of constitutional tolerance, absent extraordi-

---

16. The plaintiffs argue that the proper quota for Chicago should be calculated by applying the Chicago percentage of the statewide vote in 1976 to the 25,000 statewide requirement. This would be 26.18% of 25,000 or 6,545. The court's function in this case is not to rewrite the election code for the legislature, but to determine the outer limits of a constitutionally acceptable ballot access limitation. This can-

not be determined without consideration of evidence as to exclusionary effect of any signature requirement under 25,000.

17. This renders moot the plaintiffs' challenge that the separate statutory filing deadlines for independents and new political parties are arbitrary, irrational and discriminatory.

nary circumstances. This opinion has quoted language from *Storer v. Brown, supra,* at page 17, finding that a much more severe requirement was likely to be permissible.

Relying on this passage, the court in *Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa. 1975), held that, in the absence of special needs or other distinguishing circumstances, Pennsylvania could require state-wide candidates to obtain approximately 35,000 signatures within 21 days.

The instant 81-day period gives substantially more time to the plaintiffs in which to obtain a smaller number of signatures, although admittedly from a smaller pool of voters.[18] As a result, absent an evidentiary showing that this time period would significantly impede the access to the ballot of a reasonably diligent party or candidate, the 81-day period could not justify an order extending the filing deadline. The court will not encroach on the legislative prerogative of determining the most appropriate period within constitutional limits.

■ The question of remoteness from the actual election day does raise a more viable argument. The issues are less likely to be defined, and public interest is likely to be lower when the actual election is far off.[19] Several courts have stressed recently that a remote deadline does indeed unconstitutionally affect the ability of new parties and independents to mount a successful petition drive. *Salera v. Tucker, supra,* at 1266; *Lendall v. Bryant, supra,* at 402; *Bradley v. Mandel,* # T–76–638 (D.Md. 5/17/76); *McCarthy v. Kirkpatrick, supra,* at 374.

The cases cited by the defendants do not dispose of this line of holdings. While the Supreme Court allowed a cut-off 120 days prior to the general election in *American Party of Texas v. White, supra,* the Texas statute allowed the circulation of petitions for 55 days *after the primary.* Similarly, the deadline sanctioned in *Storer v. Brown,*

*supra,* 60 days prior to the general election, also permitted post-primary gathering of signatures. More importantly, *Salera v. Tucker, supra,* was summarily affirmed *sub nom. Tucker v. Salera,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), and is a binding statement of the law. *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).

It is true that the invalid deadlines overthrown in *Lendall* and the other cases were far more remote than the instant deadline. In *Lendall* petitions had to be submitted two months before the primary and 210 days before the general election. In *McCarthy* the Missouri law required that the petitions be in 97 days before the primary. The Maryland deadline in *Bradley* was 70 days before the primary and 239 days before the general election. *Salera* upset a deadline seven weeks prior to the primary, and as much as 218 days prior to the general election. By contrast, April 4th is only 15 days before the primary, and 64 days before the special election.

On the other hand, the courts in both *Bradley v. Mandell* and *McCarthy v. Kirkpatrick* accepted an analogy between an independent's petition circulation and a major party primary. While the comparison is not perfect, it is true that the petition campaign and the primary results both determine the final composition of the election ballot. This is the reason why the courts will sanction sterner quotas for third parties and independents than for candidates in party primaries; the latter are not guaranteed a place in the general election. As a result, a petition drive for new parties and independents is in fact equivalent to a primary.

It follows that the most fruitful time for gathering signatures is likely to be during the closing days of the primary campaign, when public interest regarding the future composition of the ballot is at a peak. The

---

18. The Pennsylvania statute required 2% of the previous voter turnout for ballot access, in contrast with the Illinois 5% requirement.

19. It is true that voter interest in a primary election may be higher in districts where nomination by the majority party is normally "tantamount" to election. Still, that interest may not reach its peak until the vote is imminent.

recent cases, cited *supra*, make it clear that it would be a significant burden on the plaintiffs to foreclose petition collection during the heat of a primary campaign by establishing a pre-primary filing deadline.[20]

This type of burden on the exercise of constitutionally protected rights is subject to strict scrutiny for a truly compelling state justification for the impediment. *Salera* and *Bradley* have rejected the argument that a pre-primary cut-off is necessary to protect the integrity of the ballot from "independent" candidacies launched by individuals defeated in the primary. While the preconclusion of spiteful splinter challenges may be essential to the preservation of the party system, there are alternative safeguards which are not so overinclusive. *See also Storer v. Brown, supra*, 415 U.S. at 724, 94 S.Ct. 1274. In any event, this is not a real problem as long as the deadline is not set after the primary results are made known.

It is true · that the Supreme Court has acknowledged that the state needs to set up a filing cut-off date to provide time for the verification of signatures, litigation of any challenges, and preparation of the final ballots. *American Party of Texas v. White, supra*, 415 U.S. at 767, no. 18, 94 S.Ct. 1296. However, *Salera* and its progeny have held that the state does not have *carte blanche* in fixing the cut-off. The date must be justified by proof of the actual time needed to accomplish the post-filing tasks.

In this regard, it is not irrelevant that the primary is also fixed with regard to the time needed to consider post-primary disputes as to the results and the conduct of the vote.

In sum, the motion to dismiss the claims regarding the filing deadlines must be denied. The appropriateness of injunctive relief on this question will depend on the evidence adduced as to urgency and possible compelling state reason for setting the filing deadline prior to the April 19th primary.

## VIII. Summary

The complaints in these two cases state a claim for relief with respect to both the signature requirements and the petition filing deadlines imposed upon new political parties and independent candidates in the forthcoming special mayoral election. Accordingly, the defendants' motions to dismiss are hereby denied.

The court declares that any requirement of more than 25,000 signatures for the mayoral petitions of the plaintiffs is unconstitutional.

Accordingly, it is ordered that the defendants, John Hanly, Marie H. Suthers, and Howard C. Medley, are permanently enjoined[21] from enforcing those portions of Ill.Rev.Stat. ch. 46 § 10–2 and § 10–3 requiring that petitions for offices serving less than the entire state contain more than 25,000 signatures. It is further · ordered that the defendants, John Hanly, Marie H. Suthers, and Howard C. Medley, are hereby enjoined to accept as valid those nominating petitions for new political parties and independent candidates in the 1977 Special Mayoral Election which contain at·least 25,-000 signatures if filed within the period as allowed by law.

For the reasons stated herein, the court will stay determination of plaintiffs' motion for an injunction establishing the signature requirement at less than 25,000, and for an injunction changing the deadline for filing of plaintiffs' petitions to a date less than 64 days removed from the general election, pending presentation of further evidence.

---

**20.** The three-judge court in *Bradley* permitted the plaintiff to collect signatures until the date of the primary. It added in a footnote that "Bradley may be entitled to more, but that case is not before us and we do not decide it."

**21.** Injunctive relief on this point is appropriate at this point. Any requirement over 25,000 is *per se* excessive in light of the requirement for statewide office. There is thus an absolute certainty of success on the merits for the plaintiffs on this claim. Without an injunction the plaintiffs will be injured in the exercise of their constitutional rights. There is no countervailing state or public interest in a denial of immediate injunctive relief.

The parties are requested to attend a pretrial conference on Thursday, March 17, 1977, at 9:30 o'clock A.M., to discuss the scheduling of a hearing in these cases, and to possibly reach a stipulated agreement for the regulations pertaining to the instant special mayoral election.